UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
TARIQ HASSAN and THE BUYING
TRIANGLE,

                      Plaintiffs,                      05 Civ. 6555 (PKC)

    -against-

                                                     MEMORANDUM
                                                     AND ORDER
DEUTCHE BANK A.G. and JEFFREY BAER,

                      Defendants.

-----------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.

        The amended complaint in this action alleges one claim for relief: tortious interference with prospective business relations. With the completion of discovery in this action, the defendants, Deutsche Bank A.G. ("Deutsche Bank") and Jeffrey Baer, now move for summary judgment, asserting that there is no evidence that defendants acted for the sole purpose of injuring plaintiffs or, regardless of their purpose, used means that amounted to a crime, independent tort or were otherwise "extreme and unfair." Plaintiffs Tariq Hassan and The Buying Triangle, LLC ("TBT") assert that the evidence raises a triable issue of fact under the "sole purpose" and "wrongful means" prongs of the tort.

        At a distant glance, plaintiffs' submission in opposition to summary judgment appears so weighty as to likely present at least one material fact in dispute. By my calculation, plaintiffs have submitted more than 1,900 pages of deposition transcripts in opposition to the motion.[1] Here, I conclude that the material facts on which plaintiffs rely would not permit a reasonable jury to find in their favor under the standard articulated by the New York Court of

---

[1] To some extent, plaintiffs have loaded the record. Where any portion, however slight, of a deponent's testimony has been relied upon, the entire transcript has been submitted.

Appeals for a claim of tortious interference with prospective business relations.  Defendants' motion for summary judgment will be granted.

    I.  <u>The Parties and Their Relationship to Accenture</u>

        For the purposes of this motion, this Court accepts as true plaintiffs' version of the facts, though not necessarily the conclusory labels that they have attached to those facts. This Court also accepts as true those facts tendered by the defendants which plaintiffs have not disputed.  All reasonable inferences have been drawn in plaintiffs' favor.

        Deutsche Bank decided to outsource its global purchasing and accounts payable functions and, in January 2004, entered into a seven-year arrangement with Accenture LLP ("Accenture").  (Pl. Resp. to Rule 56.1 ¶ 3; Pl. Rule 56.1 ¶ 123.)[2]  The arrangement contemplated Accenture handling procurement in 77 countries and processing one million invoices annually.  (Pl. Resp. to Rule 56.1 ¶ 4.)[3]  Deutsche Bank was Accenture's "anchor client."  (Pl. Rule 56.1 ¶ 125.)  It became important to Deutsche Bank that Accenture succeed and grow its business because it would achieve cost savings from Accenture's ability to spread its costs over a larger customer base.  (Pl. Resp. to Rule 56.1 ¶ 33-35.)  If Accenture failed as a business, then, at a minimum, Deutsche Bank would need to develop a new procurement outsourcing vendor.  (<u>Id.</u> at ¶ 36.)

        The association between Deutsche Bank and its independent procurement arm, Accenture, was close.  Deutsche Bank had the right to tell Accenture who could work on its account.  (Pl. Rule 56.1 ¶ 136.)  Before hiring a new employee to work on the account,

---

[2] In this Memorandum and Order, I will cite to plaintiffs' response to defendants' statement of material facts not in dispute which is required by Local Rule 56.1 ("Pl. Resp. to Rule 56.1") and to plaintiffs' own Rule 56.1 statement ("Pl. Rule 56.1").  The response and statement cite to record evidence and this court has considered the underlying evidence.
[3] Accenture formed a unit or entity known as Accenture Procurement Solutions ("APS") and, except where expressly noted, I will refer to Accenture and APS collectively as "Accenture."

Accenture arranged for the employee to meet with a representative of Deutsche Bank. (Id. ¶ 138.)

Plaintiff Hassan had been the Global Head of Purchasing for Deutsche Bank since January 2002. (Pl. Resp. to Rule 56.1 ¶ 1.) In May 2004, Deutsche Bank removed Hassan as head of procurement and replaced him with defendant Jeffrey Baer. (Id. ¶ 6.) According to Hassan, at the time of his separation from Deutsche Bank, the bank wanted Accenture to hire Hassan because this would mitigate any claim by Hassan that because of his age he would have difficulty finding suitable employment. (Id. ¶ 9.) Deutsche Bank offered to contribute towards Hassan's retention, but Accenture declined. (Id. ¶ 10-11; Sherman Dep. 214-17.)

After leaving Deutsche Bank, Hassan formed a limited liability company, The Buying Triangle, LLC, and entered into a consulting agreement with Accenture; the parties to the agreement were Accenture LLP and "Tariq Hassan of the Buying Triangle, llc." (Id. ¶ 14-16.) The consulting agreement became effective as of September 1, 2004, and had a termination date of August 31, 2005, unless extended in writing. (Id. ¶ 18.) Either party to the agreement had the right to terminate the agreement "without cause" on seven-days written notice. (Id. ¶ 19-20.)

On or about April 7, 2005, Accenture informed Hassan that it was exercising its right to terminate the consulting arrangement. (Id. ¶ 74.) It is plaintiffs' business relationship with Accenture with which defendants are alleged to have tortiously interfered.

Having set forth the backgrounds of the parties, I will defer further discussion of the facts until, first, discussing the standards governing a summary judgment motion and, then, laying out the elements of a claim of tortious interference with prospective business relations under New York law.

II.  Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief.  A fact is material if it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law.  Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (citations omitted).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant.  Rule 56(e), Fed. R. Civ. P.  In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'"  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (citation omitted).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact

4

could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (quotations and citations omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c). In the absence of any disputed material fact, summary judgment is appropriate. Id.

   III.   Legal Standards: Tortious Interference with Business Relations

Here, the contract between Accenture and plaintiffs was terminable without cause on seven-days notice. The parties agree that any interference therewith is assessed under the tort of interference with business relations or prospective business advantage, rather than under a theory of tortious interference with contract. See Kosson v. Algaze, 203 A.D.2d 112 (1st Dep't 1994) (absent a contractual breach, no claim for tortious interference with contract lies), aff'd 84 N.Y.2d 1019 (1995).

The Second Circuit, having surveyed New York case law, has observed that "to prevail on such a claim, a plaintiff must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003) ("Carvel I") (citing Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997)). The Second Circuit also noted that "[t]he tort of intentional interference with prospective economic relations is relatively simple to understand in theory—but notoriously complicated in practice." Carvel I, 350 F.3d at 18.

In the context of addressing a question certified by the Second Circuit in Carvel I, the New York Court of Appeals held that unless the conduct at issue is "criminal or

5

independently tortious," to establish the tort, the plaintiffs must prove that "defendant[s] [have] engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiffs." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004) ("Carvel II") (internal quotation marks and citation omitted). A motive of "normal economic self-interest" is inconsistent with a sole purpose of inflicting intentional harm. Id. at 190; accord Lawrence v. Union of Orthodox Jewish Congregations of America, 32 A.D.3d 304 (1st Dept. 2006). The Carvel II Court further noted that, in applying New York law, federal courts have correctly observed that "conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." Carvel II, 3 N.Y.3d at 192 (citations omitted).

At the time Carvel II was decided, there was support among some commentators for a two-tiered approach to assessing the degree of culpability of the means used to interfere with business relationships. The entire subject, including the position taken by Restatement (Second) of Torts § 766B, is thoughtfully reviewed in Judge Wesley's opinion in Carvel I. See 350 F.3d at 18-22. Under the two-tiered approach, if the interfering party was a head-to-head competitor, plaintiff would need to establish "wrongful" means—such as conduct that was criminal or independently tortious. Id. at 19, 21. If, however, the interfering party was not a competitor, only "improper" means would need to be established. It suffices to note that the "improper" standard was less stringent and could include violation of ethical codes or established business customs. Id. at 18-19.

The New York Court of Appeals, in Carvel II, addressed the relevance of the plaintiff's competitor status in the context of a claim for tortious interference with business relations and, implicitly rejecting the two-tiered approach, held that wrongful means must be

established even if the interfering party is not a market competitor. 3 N.Y. 3d at 191-92.[4] "Wrongful means include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." Carvel II, 3 N.Y.3d at 191 (internal quotation marks and citation omitted). "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be 'lawful' and thus insufficiently 'culpable' to create liability for interference with prospective contracts or other nonbinding economic relations." Id. at 190.[5] The Carvel II Court declined to address "whether any other exception to the general rule exists—whether there can ever be other instances of conduct which, though not a crime or tort in itself, was so 'culpable,' . . . that it could be the basis for a claim of tortious interference with economic relations." Id. at 190-91. The Carvel II court left open the possibility that "extreme and unfair 'economic pressure'" may also constitute "wrongful" means. Id. at 192-93.

  IV.  Application of Legal Standard to the Facts

    A.  Causation

Defendants argue that no words or deeds on their part caused Accenture to terminate Hassan and, hence, they are entitled to summary judgment in their favor. They point to a change in CEOs—the new CEO took office days before the agreement with Hassan was signed—and the CEO's evolved position, in view of poor financial performance, to terminate all senior consulting agreements. (Brakeley Decl.¶ 4-6.) Plaintiff counters with evidence in the

---

[4] The status of the parties as competitors bears relevance on the "motivation" prong but it does not control the type of "means" which are actionable. Id.

[5] I agree with Judge Leisure that the "broad and decisive language in response to a certified question from the Second Circuit" suggests that the Carvel II Court "intended to do more than merely 'discuss' existing law . . . and instead sought to clarify this element of the tort." Treppel v. Biovail Corp., 2005 WL 427538, at *7 (S.D.N.Y. 2005).

form of emails and deposition testimony that defendant Baer had complained to Accenture concerning Hassan in the days leading up to the termination of his agreement. (See, e.g., Licul Decl., Ex. 24; Baer email to Astorian of Accenture, dated April 5, 2005: "You guys should stop using him . . . .")  I conclude that there is sufficient evidence on which a reasonable jury could conclude that defendants' actions caused the termination of plaintiffs' consulting agreement with Accenture and, accordingly, reject the assertion that summary judgment should be granted on the ground of lack of causation.

    B.  Motivation and Wrongful Means

Plaintiffs rely upon a series of events as evidence of a sole purpose on the part of defendants to inflict injury upon plaintiffs or the use of wrongful means by defendants to interfere with plaintiffs' relationship with Accenture.  The facts relative to these circumstances could potentially have bearing on either prong (motivation or wrongful means) and so I will address the evidence on an event-by-event basis.  However, because facts viewed in isolation may take on greater significance when viewed in the light of the overall picture, I will also consider each separate incident in the context of the entirety of plaintiffs' evidence.

    1.  The IDC Study

IDC sponsors industry seminars and publishes research for which subscribers pay. (Pl. Rule 56.1 ¶ 209.)  Both Hassan and Baer were interviewed in connection with an IDC study of Deutsche Bank's procurement outsourcing program.  (Id. ¶ 212-13.)  A draft of the IDC study contained over 30 references to Hassan.  (Id. ¶ 213.)  Baer was concerned because "it was Tariq all the way through.  There was no mention of Jeff." (Easton Dep. 96.)  Baer faxed his changes to the author of the study with a single point on the cover page: "need to depersonalize Hassan & his role!" (Pl. Rule 56.1 ¶ 221.)  The draft IDC study was revised and individuals were not

8

mentioned by name. (Id. ¶ 222-23.) Hassan viewed this change as impairing the utility of the article in promoting his own business. (Pl. Resp. to 56.1 ¶ 92.)

Plaintiffs assert that defendants were motivated by a desire to enhance Baer's role and minimize Hassan's role. (See, e.g., Pl. Rule 56.1 ¶ 146 ("Baer admitted that he was 'personally annoyed' because 'it felt like this was another attempt to gain singular credit without sharing it with the bank.'"), ¶ 148 ("Baer testified that he felt he was doing all the work while Hassan was doing nothing."), ¶ 150 ("In 2004, Baer stated to Astorian, 'I'm doing all the work. Tariq is getting all the publicity.'")).

Baer is sued individually and his conduct is properly assessed as an independent economic actor. In the public allocation of praise or credit for Deutsche Bank's procurement policy, it was in Baer's economic self-interest to ensure that his role was maximized, even if that was at the expense of praise for Hassan. To the extent that Baer is viewed by the outside world as having a larger role in the project, then his value to Deutsche Bank and his marketability outside of Deutsche Bank are enhanced. A motivation to prevent Hassan from getting predominate credit for the project is not one "for the sole purpose of inflicting intentional harm on plaintiffs." Carvel II, 3 N.Y.3d at 190 (quoting NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc., 215 A.D.2d 990 (3d Dep't 1995), aff'd, 87 N.Y.2d 614 (1996)). A motive of "normal economic self-interest" is inconsistent with a sole purpose of inflicting intentional harm. Id.

Similarly, it was in Deutsche Bank's economic self-interest to promote its incumbent employee, Baer, or the entire internal team, as the significant force behind the program. To the extent that the success of the program was important to investors or vendors, it was in Deutsche Bank's economic self-interest to promote itself as maintaining the expertise to

9

keep the program rolling forward as a success.  Any marketplace perception that Deutsche Bank had allowed the single mastermind of the program to walk out the door would be detrimental to it.

Of course, that defendants were motivated by economic self-interest does not speak to whether they utilized wrongful means.  Nothing approaching wrongful means has been demonstrated with respect to the IDC study.  No "extreme and unfair" conduct has been shown.  Baer successfully lobbied IDC to make the change.  Urging IDC to credit the bank staff collectively rather than emphasizing the work of a former employee is not wrongful.  Baer used nothing more than persuasion.

    2.  The Taping of Hassan's Speech at an IDC conference

Accenture terminated its consulting relationship with Hassan on April 7, 2005. (Pl. Resp. to Rule 56.1 ¶ 74.)  He was scheduled to speak at an IDC conference on April 19-20, 2005 and, indeed, did so.  (Pl. Rule 56.1 ¶ 238.)  Baer caused a Deutsche Bank employee to tape record a presentation by Hassan at the IDC conference.  (Id. ¶ 245-46.)  Neither Baer nor Deutsche Bank sought permission for the tape recording from Hassan or IDC.  While plaintiffs acknowledge that the taping occurred after the termination, they point out that Baer's requests of Deutsche Bank employees to conduct the recording were made before the termination by Accenture.  Plaintiffs allege that the secret taping amounts to wrongful means and point out that several employees turned down Baer's request to conduct the taping.

There is no evidence that the person at Accenture who made the decision to terminate Hassan knew of the anticipated taping.  (Hassan Dep. 240; Comerford Dep. 66.)  The actual taping could not have interfered with the already-terminated agreement.  At most, it was

conduct directed at Hassan and not action directed at Accenture, the third-party with whom plaintiffs had a business relationship.

Taping a presenter at a conference without the presenter's prior permission is certainly discourteous and conduct to which the speaker—and the conference sponsor—could take legitimate offense. It does not, however, satisfy the "wrongful" or "culpable" standard which New York follows, nor could it qualify as "the sort of egregious wrongdoing that might support a tortious interference claim in the absence of such an independently unlawful act or evil motive." Carvel II, 3 N.Y.3d at 189. No laws were violated. There was no published notice or policy of IDC that prohibited the taping. (Black Decl. ¶ 5.)

3. Recommendations to Potential Accenture Clients

As noted at the outset, the success of Accenture was important to Deutsche Bank. (Pl. Resp. to Rule 56.1 ¶ 33-35.) It was in Deutsche Bank's interest to provide supportive recommendations of Accenture to third parties whose use of Accenture was deemed by Deutsche Bank to be compatible. (See, e.g., Pl. Rule 56.1 ¶ 125, 129.) Baer provided references for Accenture on at least 15 occasions, but was not interested in talking to every potential Accenture client. (Id. ¶ 129-30.)

Baer elected not to meet with a representative of Burlington Northern Sante Fe Railroad ("BNSF"), even though Accenture had asked him to do so. (Id. ¶ 255, 257.) Accenture asked Hassan to meet with BNSF and he did so. (Id. ¶ 258-59.) Although Hassan made it clear to BNSF that he was "the ex-CPO [of Deutsche Bank], the founder of the Buying Triangle and part time advisor to Accenture," id. ¶ 261, Baer's perception was that Hassan, an ex-employee, was endeavoring to give the functional equivalent of a recommendation from Deutsche Bank, something to which Baer objected. (Baer Dep. 336-37.) "I am the only official authorized

11

reference for Accenture, unless I delegate that to someone else on a case by case basis." (Pl. Rule 56.1 ¶ 265.)  Baer told Accenture that he was not willing to have a discussion with a potential client if Hassan had spoken to that client. (Id.)

Leonard Sherman, former president of Accenture Procurement Solutions, testified that he was told by Drew Pipkin, a consultant working for BNSF, that Hassan had misrepresented himself to BNSF as presently working for Deutsche Bank.  (Sherman Dep. 291-92.)  BNSF reported to Accenture that they viewed Hassan's statements as presenting "an integrity issue."  (Licul Decl., Ex. 25.)  Thereafter, Baer, who learned of the incident second-hand, brought it up in his discussions with Accenture regarding Hassan.  (Pl. Rule 56.1 ¶ 278.)

Richard Grassel of Accenture asked Hassan to meet with representatives of National City, another potential Accenture client, on April 5, 2005.  (Id. at ¶ 266.)  Hassan sent Grassel an e-mail informing him that National City was also meeting with Deutsche Bank on April 5 and that Baer had already indicated to Accenture that he would not meet with any potential client that Hassan would also be meeting with.  (Id. at ¶ 267.)  Sherman forwarded Hassan's e-mail to Astorian and wrote, "It is bad pool to say the least for JB to heavily promote us to engage Tariq in the first instance, then impose significant constraints on his use, I do not want to create any embarrassments for us or our prospective clients."  (Id. at ¶ 269.)  Accenture thereafter made the decision to cancel Hassan's meeting with National City.  (Id. at ¶ 271.)

In response to defendants' motion for summary judgment that asserts that there is no evidence of a sole motive on their part to injure, it became plaintiffs' obligation to come forward with evidence to the contrary.  In the absence of such evidence, the movant is entitled to summary judgment.  Goenaga v. March of Dimes Birth Defects Fdn., 51 F.3d 14, 18 (2d Cir. 1995) ("[T]he movant's burden will be satisfied if he can point to an absence of evidence to

support an essential element of the nonmoving party's claim"); see also Gallo v. Prudential Residential Services, L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.") (citation omitted). Here, plaintiffs assign labels, characterizations and conclusions to evidence that is entirely consistent with defendants' economic self-interest. Baer was entitled to protect his turf as an independent economic actor. His stated position ensured that he would remain valuable to his employer. From Deutsche Bank's standpoint, restricting recommendations to those given by incumbent employees ensured that none were given to persons or entities whose interests might be hostile to the bank, that the recipient would feel beholden to the bank for taking the time to meet, and that accurate, non-confidential information was transmitted, portraying the bank in a favorable light.

No "wrongful" means were employed. In the case of BNSF, Baer did little more than remind Accenture of what it already learned directly from BNSF, i.e. that BNSF was displeased with how Hassan explained his present status and relationship to Deutsche Bank. In this regard, Hassan's denial that he misled BNSF is immaterial; it was BNSF's reaction that was relevant to Baer and Accenture. In the case of National City, Baer, in furtherance of his own economic interests, simply imposed restrictions on the potential clients with whom he was willing to meet. This conduct cannot reasonably be characterized as "extreme and unfair" under New York law.

    4. ING

ING, the financial institution, was a potential client of Accenture with whom Baer had spoken. (Pl. Resp. to Rule 56.1 ¶ 56-57.) On April 5, Baer sent an email to a key Accenture contact in which he noted that he had spent a "[f]ull day of Accenture references . . . . Got some

13

feedback on how Tariq is being received from ING who heard him at a conference. You guys should stop using him-can fill you in later." (Liluc Decl., Ex. 24.) Baer reported to Accenture that Michael Knipper of ING told Baer that, after listening to a speech by Hassan, ING had concluded that procurement was a bad idea. (Pl. Resp. to Rule 56.1 ¶ 29.) Baer testified that representatives of ING had said that Hassan had said that Deutsche Bank politics had prompted the bank to enter into its deal with Accenture; Baer conveyed the substance of this to Accenture. (Baer Dep. 316-17, 326.) Hassan asserts that Knipper said no such thing and therefore Baer lied to Accenture, which, plaintiffs assert, satisfies the wrongful means standard. (Pl. Resp. to Rule 56.1 ¶ 29.)

Knipper has submitted two declarations in this action. The first says that Hassan made an informative presentation and that, partly based upon his presentation, ING continued to explore the procurement outsourcing deal between Deutsche Bank and Accenture; he says he does not recall anyone at the meeting with Baer stating that Hassan had said anything about Deutsche Bank politics. (Knipper Decl. ¶ 4, 6, 8.) The second declaration of Knipper states that "[t]o the extent that Mr. Baer recalls me or [another representative of ING] stating during our meeting in April of 2005 that we had attended a speech given by Mr. Hassan in which he implied that Deutsche Bank politics had prompted Deutsche Bank to enter the procurement deal with Accenture, and that our discussion with Mr. Baer had helped clarify the business reasons underlying Deutsche Bank's decision to outsource procurement functions, I cannot deny that such a statement was made." (Knipper Supp. Decl. ¶ 7.)

Baer's statement concerning ING's report on Hassan's remarks remains uncontradicted in this record; the material point is not what Hassan actually said but what ING reported to Baer that he said. There is no evidence in this record from which a reasonable jury

could conclude that Baer lied to Accenture when he reported what he says he remembers having been told by ING. The conduct does not amount to "wrongful" means or "extreme and unfair" economic pressure.

V.   Conclusion

> Although defendants' summary judgment motion turns on consideration of plaintiffs' evidence on defendants' motives and the nature of their interfering acts, it does not necessarily follow that a jury need be empanelled. While only federal summary judgment standards apply in this Court, I note that, since Carvel II, New York courts repeatedly have approved of the use of summary judgment on issues of motivation and means in the context of the tort at issue. See Barrett v. Toroyan, 39 A.D.3d 366 (1st Dept. 2007) (affirming grant of summary judgment in favor of defendants on motive and means); Lawrence, 32 A.D. 3d at 304 (reversing denial of summary judgment in favor of defendants on motive and means); Cooper v. Hodge, 28 A.D.3d 1149 (4th Dept. 2006) (reversing denial of summary judgment in favor of defendant on means); Lerwick v. Kelsey, 24 A.D.3d 918 (3d Dept. 2005) (affirming grant of summary judgment in favor of defendants on motive and means), lv. den., 6 N.Y.3d 710 (2006).

> This Court has considered plaintiffs' evidence, in a light most favorable to them, measured against New York standards for a claim of tortious interference with prospective business relations. The evidence has been considered separately, as to each allegedly interfering act, and as to all acts taken as a whole. No reasonable jury could conclude on this record that defendants acted for the sole purpose of inflicting injury upon plaintiffs or utilized means that amounted to a crime, an independent tort or "extreme and unfair" economic pressure.

> Accordingly, defendants' motion for summary judgment is granted. The Clerk is directed to enter judgment for the defendants.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
September 27, 2007

16